IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 06-00391-01-CR-W-FJG |
| ) | |
| ALPHONZO HENDERSON, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS STATEMENT**

Before the court is Defendant's Motion to Suppress Statement on grounds that Defendant's October 22, 2006, statement to Detective Eastwood was obtained in violation of the Fifth Amendment. Defendant moves the court to suppress this statement, arguing that (1) intoxication prevented him from voluntarily waiving his Miranda rights and (2) questioning should have stopped when he asked for an attorney.

*I. BACKGROUND*

On October 22, 2006, Defendant was arrested by Kansas City, Missouri police officers for being a felon in possession of a firearm. He was transported to police headquarters where he was placed in the Detention Unit. Detective Garry Eastwood made contact with Defendant approximately forty-five minutes later, at which time he did not believe Defendant was intoxicated. Detective Eastwood advised Defendant of his Miranda rights and obtained a waiver. He questioned Defendant for thirty to forty-five minutes and Defendant gave an oral statement. Defendant was then returned to his cell.

1

Defense counsel filed the instant motion to suppress statements on May 8, 2007, while Defendant was undergoing a psychological evaluation (Doc. No. 66). The government responded to Defendant's motion on May 24, 2007 (Doc. No. 67). On September 10, 2007, after Defendant had been found competent to stand trial, I conducted an evidentiary hearing. The government appeared by Assistant United States Attorney Stefan Hughes. Defendant was present, represented by appointed counsel Anita Burns. The government called Kansas City, Missouri Police Department Detective Garry Eastwood to testify. Defendant called Special Agent Daniel Cassidy, ATF, to testify; Defendant also testified on his own behalf. In addition, the following exhibits were marked and admitted into evidence:

>Government's Exhibit 1: Miranda Waiver Form
>Government's Exhibit 3: Statement
>
>Defendant's Exhibit 1: Copy of Booking Photo

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. Detective Garry Eastwood has been employed by the Kansas City, Missouri Police Department for fifteen and a half years (Tr. at 3, 38). Over the course of his career, he has dealt with thousands of suspects who were under the influence of alcohol or drugs (Tr. at 7). In determining whether a suspect may be impaired, Detective Eastwood considers: whether he can smell alcohol; whether the suspect's eyes are jumpy, bloodshot, or erratic; whether the suspect acts erratic; whether the suspect is able to comprehend questions; and the suspect's posture (Tr. at 32). When looking

2

Case 4:06-cr-00391-ODS   Document 97   Filed 09/24/07   Page 2 of 14

for evidence of the use of drugs other than alcohol, Detective Eastwood is trained to look for similar characteristics as well behavior indicators such as hyperactivity (Tr. at 33).

2. On October 22, 2006, police were dispatched to the 2200 block of Oakley in Kansas City, Missouri, regarding a felon in possession of a firearm (Tr. at 3-4). They arrived on the scene at approximately 7:08 p.m. and Defendant was arrested shortly thereafter (Tr. at 4, 13-14). After being arrested, Defendant was taken to police headquarters and was booked and photographed at 8:56 p.m. (Tr. at 5, 24-25). His eyes are partially closed in the booking photograph (Tr. at 25; Defendant's Exh. 1).

3. If jailers believe a suspect is either drunk or high, the suspect is placed by him- or herself in an isolation tank (Tr. at 6). Kansas City Police Department procedure prevents detectives from interviewing a suspect who is drunk or high (Tr. at 14). Instead, procedure dictates that the suspect is left in or returned to jail and not interviewed until he or she is sober (Tr. at 14-15, 31-32).

4. Defendant was not placed in the isolation tank but, instead, in the eighth floor Detention Unit (Tr. at 6).

5. Prior to interviewing Defendant, Detective Eastwood spoke to one of the officers who responded to the scene (Tr. at 22). The officer stated he had been dispatched to a house concerning a domestic dispute and a rifle was found (Tr. at 22-23). Defendant's mother-in-law and a child both stated Defendant had a rifle; Defendant's wife said very little (Tr. at 23).

6. Detective Eastwood first made contact with Defendant at approximately 9:45 p.m. in the Detention Unit (Tr. at 5, 6, 20; Government's Exh. 3). Jailers brought Defendant into the lobby where Detective Eastwood was waiting (Tr. at 16-17). Defendant looked normal and was standing on his own (Tr. at 17).

7. Detective Eastwood introduced himself and took Defendant to the second floor interrogation rooms (Tr. at 5, 6, 17; Government's Exh. 3). Detective Eastwood walked behind Defendant and did not observe anything abnormal about his posture or gait (Tr. at 18). He did not smell any odor of intoxicants on Defendant (Tr. at 18). Defendant was lucid and did not appear to be drunk or high (Tr. at 5-6, 15).

8. Detective Eastwood testified that, based on his experience, he had no doubt that Defendant was neither drunk nor high on October 22, 2006, at 9:45 p.m. (Tr. at 7). Detective Eastwood did not administer any type of sobriety test to Defendant but, instead, took note of Defendant's odor, eyes, posture, and ability to comprehend questions and did not see any indication that Defendant was intoxicated (Tr. at 20, 32-33).

9. At 9:51 p.m., Detective Eastwood advised Defendant of his <u>Miranda</u> rights by reading him the standard <u>Miranda</u> waiver form (Tr. at 6, 52-53; Government's Exh. 1; Government's Exh. 3). Detective Eastwood and Defendant were the only people in the room (Tr. at 6, 19). At the time Defendant was read his <u>Miranda</u> rights, he appeared normal (Tr. at 6). Defendant's eyes were clear and Detective Eastwood did not have any reason to believe Defendant was not lucid (Tr. at 6-7). Likewise,

4

Case 4:06-cr-00391-ODS   Document 97   Filed 09/24/07   Page 4 of 14

Defendant's speech was normal and did not suggest to Detective Eastwood that Defendant was drunk or high (Tr. at 7).

10. After reading Defendant his <u>Miranda</u> rights, Detective Eastwood gave Defendant the waiver form, told him he could review it, and asked him to sign the waiver if he understood and agreed (Tr. at 19, 53). Detective Eastwood did not ask Defendant to read the form aloud, as he had just read it to him (Tr. at 19). Detective Eastwood testified he did not tell Defendant that executing the <u>Miranda</u> waiver was just a mere formality (Tr. at 19-20). He stated Defendant did not ask him if he needed an attorney or ask for an attorney (Tr. at 19, 52, 53, 55). He stated Defendant did not indicate that he wanted to exercise his right to remain silent (Tr. at 54). Detective Eastwood further testified that had Defendant asked for an attorney or indicated he wanted to remain silent, he would have taken Defendant back to his cell (Tr. at 54).

11. Detective Eastwood then asked Defendant if he understood the rights (Tr. at 8). Defendant stated that he did and executed a <u>Miranda</u> waiver form without difficulty (Tr. at 8-9; Government's Exh. 1; Government's Exh. 3). Defendant did not have any difficulty telling Detective Eastwood his name, age or address (Tr. at 9; Government's Exh. 1). Nothing about Defendant's speech led Detective Eastwood to conclude he was incoherent or less than lucid; rather, Defendant's responses to Detective Eastwood's questions were appropriate (Tr. at 9). As a result, Detective Eastwood did not ask Defendant whether he was under the influence of drugs or alcohol (Tr. at 20, 27).

5

12. Detective Eastwood questioned Defendant for approximately thirty to forty-five minutes during which time Defendant gave an oral statement (Tr. at 10). Defendant initially denied possessing the firearm several times (Tr. at 21-22). He then told Detective Eastwood that the rifle in the residence belonged to a man Defendant believed was having an affair with his wife (Tr. at 11; Government's Exh. 3). Defendant stated he did not know how long it had been there (Tr. at 11; Government's Exh. 3). He further stated he had touched the rifle earlier in the day when he asked his wife what it was doing there, but did not remember where on the rifle he touched (Tr. at 11; Government's Exh. 3). Defendant was unsure whether his fingerprints would be on the shell that was in the rifle (Tr. at 11; Government's Exh. 3). Finally, Defendant stated he did not do anything with the rifle because it was not his (Tr. at 11; Government's Exh. 3). Detective Eastwood summarized this statement in a report (Tr. at 10-11; Government's Exh. 3).

13. Defendant was returned to the Detention Unit at 10:35 p.m. (Tr. at 11-12; Government's Exh. 3).

14. Based on his knowledge, experience, and specific recollection of the interrogation, Detective Eastwood testified he believed Defendant's statement was voluntarily given (Tr. at 54).

15. ATF Special Agent Daniel Cassidy interviewed Allie Bennett, Defendant's mother-in-law, on November 1, 2006, about Defendant's October 22, 2007 arrest (Tr. at 34-35). Ms. Bennett stated that prior to the incident, Defendant left to purchase food (Tr. at 36). When he returned approximately fifteen minutes later, he was not himself

and acted completely different than when he left (Tr. at 36). Special Agent Cassidy asked Ms. Bennett if she thought Defendant was on any kind of medication, and she stated Defendant appeared to be under the influence of alcohol and/or narcotics and thought someone was inside the house (Tr. at 37). Ms. Bennett stated there was no one in the house, but Defendant continued to think as he walked around the house with a shotgun that someone was hiding -- possibly another man who was in a relationship with his wife (Tr. at 38).

16. Special Agent Daniel Cassidy has almost twenty years of experience and has interviewed witnesses who were either drunk or high (Tr. at 38). Based on his experience, he testified it is possible for an individual to be drunk or high at one point and sober two hours later (Tr. at 38).

17. Defendant testified he drank "quite a bit" of alcohol on October 22, 2006 (Tr. at 40). Specifically, he stated he an others drank Paul Mason cognac and beer all day while watching football and that they drank "pints at a time, gallons" (Tr. 40-41). Defendant stated he personally drank over a case of beer (Tr. at 41, 49). After that, Defendant stated they drank over a fifth and a half of Remy Martin and also some gin (Tr. at 41). Defendant further testified he smoked an unknown amount of marijuana (Tr. at 42).

18. Defendant testified he remembered very little about being arrested and really just recalled the shock of seeing the police (Tr. at 42). On cross-examination, Defendant testified an officer told him they were bringing a tactical team because they knew he was intoxicated and/or drunk and thought he was going to be a problem (Tr. at 49).

7

He said the officer also told him she could smell liquor on him from five feet away (Tr. at 49).

19. Defendant stated he remembered very little about being taken to the police station (Tr. at 42). He did not remember entering a holding cell (Tr. at 42). Defendant stated he tried to used the telephone but could not find it because he was "wasted"; although the phone was on the wall, he could not see the numbers (Tr. at 42).

20. Defendant vaguely remembered walking to the lobby to meet Detective Eastwood (Tr. at 42-43). He did not remember being read his <u>Miranda</u> rights (Tr. at 43).

21. Defendant testified he asked Detective Eastwood what he wanted, and that Detective Eastwood responded by saying he just wanted to talk (Tr. at 43). Defendant testified he then asked Detective Eastwood if he needed an attorney and whether he could have an attorney (Tr. at 43). He stated Detective Eastwood told him that this was just a formality and not to worry about it (Tr. at 43).

22. Defendant testified Detective Eastwood told him it looked like he had been drinking all day, to which Defendant responded that he drank a lot watching football all day (Tr. at 43, 48). He testified he told Detective Eastwood he drank gin and had used marijuana and cocaine (Tr. at 48-49).

23. Defendant did not remember being administered a Breathalyzer or being given any sobriety tests, but did remember that Detective Eastwood kept trying to give him cigarettes (Tr. at 43, 49, 50). Defendant stated Detective Eastwood repeatedly asked him if he wanted a cigarette to bring him down from whatever he was on, but that he told Detective Eastwood he did not smoke (Tr. at 43-44, 50).

8

Case 4:06-cr-00391-ODS   Document 97   Filed 09/24/07   Page 8 of 14

24. Defendant testified he was unable to read the Miranda form himself (Tr. at 44). He said he asked Detective Eastwood why he needed the form and Detective Eastwood told him he would talk to him if he was not guilty of anything (Tr. at 44).

25. Defendant testified that as he was signing the Miranda waiver form, he asked Detective Eastwood what he was signing (Tr. at 44). Detective Eastwood reportedly told him it was something that would get everything out on the table (Tr. at 44). Defendant stated he was only able to sign his name with the help of Detective Eastwood since he could not even hold a pen straight (Tr. at 46).

26. Defendant denied telling Detective Eastwood that the rifle in the residence belonged to a man with whom he believed his wife was having an affair (Tr. at 46-47). He denied saying he did not know how long the gun had been inside the house (Tr. at 47). He also denied admitting to touching the rifle when he asked his wife what it was doing in the house (Tr. at 47). He denied ever saying he touched the rifle and that he was unsure whether his fingerprints would be found on the shell inside the rifle (Tr. at 47). Defendant denied saying he did not do anything with the rifle because it was not his (Tr. at 48).

27. Defendant testified that he threw up when he was returned to his holding cell and continued to feel nauseated thereafter (Tr. at 44). He said the jailer brought him coffee and he threw up again (Tr. at 44). Defendant testified he did not remember anything after that (Tr. at 44).

## III. LEGAL ANALYSIS

Defendant's motion seeks to suppress his statement on grounds that intoxication prevented him from voluntarily waiving his Miranda rights and speaking to Detective Eastwood. During the suppression hearing, Defendant testified Detective Eastwood questioned him despite his request for an attorney. Based on this testimony, defense counsel requested the Court analyze whether Defendant's statement should be suppressed on this ground as well (Tr. at 51).

### Admissibility of Statement

In order to use a statement made by a defendant during custodial interrogation, the government must prove by a preponderance of the evidence that the law enforcement officer to whom the statement was made first informed the defendant of his right against self-incrimination and obtained a waiver from the defendant of that right. Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also Colorado v. Connelly, 479 U.S. 157, 168 (1986). When evaluating whether custodial statements are admissible, a court must engage in a two-step analysis. First, the defendant's waiver must have been voluntarily, knowingly and intelligently given in order to be valid. United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994). If the waiver is found valid, the court must then ascertain whether the defendant voluntarily made the statement at issue. Connelly, 479 U.S. at 169.

**A.     Voluntary, Knowing and Intelligent Waiver of Miranda Rights**

A waiver is "voluntary" if it is the defendant's "free and deliberate choice," and made without "intimidation, coercion or deception." Connelly, 479 U.S. at 170. For the waiver to be "knowing" and "intelligent," a defendant must have a "full awareness" of the nature of his right against self-incrimination and understand the consequences of waiving that right. Moran v. Burbine,

10

Case 4:06-cr-00391-ODS   Document 97   Filed 09/24/07   Page 10 of 14

475 U.S. 412, 420 (1986). The court looks to the totality of the circumstances surrounding the defendant's interrogation in determining whether his waiver was valid. Id. at 421. Relevant factors include, inter alia, the defendant's background, experience and conduct, and whether the defendant expressly stated that he was waiving his rights. Id.; North Carolina v. Butler, 441 U.S. 369, 373 (1979). A waiver made while under the influence of drugs is not involuntary per se. United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998); United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990). "If the individual indicates in any manner, at any time prior or during questioning . . . that he wants an attorney the interrogation must cease." Miranda, 475 U.S. at 420.

The totality of the circumstances in this case show that Defendant's waiver was voluntary, knowing and intelligent. Detective Eastwood advised Defendant of his Miranda rights by reading him the standard Miranda waiver form. He then gave Defendant the form and told him he could review it. When Detective Eastwood asked Defendant whether he understood his rights, Defendant stated that he did and signed the Miranda waiver form. Defendant did not have any difficulty telling Detective Eastwood his name, age or address.

There is conflicting evidence surrounding whether Defendant was intoxicated. Defendant testified he had used drugs and consumed a large quantity of alcohol prior to being arrested on October 22, 2006, and could not remember being read his Miranda rights. Defendant also testified Detective Eastwood told him he looked like he had been drinking and that Defendant specifically told Detective Eastwood he drank gin and had used marijuana and cocaine. Defendant stated he was unable to read the Miranda form and could only sign the waiver with Detective Eastwood's assistance since he could not hold a pen straight. By contrast, Detective Eastwood testified Defendant was neither drunk nor high. As jailers escorted Defendant to the lobby of the Detention

11

Unit where Detective Eastwood was waiting, Defendant looked normal and was walking on his own. Detective Eastwood neither noticed anything abnormal about Defendant's posture or gait as they walked to the interrogation room, nor smelled an odor of intoxicants. He stated Defendant was lucid and did not appear to be drunk or high. Specifically, nothing about Defendant's odor, eyes, posture, ability to comprehend and respond to questions, or speech indicated he was intoxicated.

    I find the testimony of Detective Eastwood to be more credible than that of Defendant. Detective Eastwood has fifteen and a half years of experience with the Kansas City, Missouri Police Department. Over the course of his career, Detective Eastwood has dealt with thousands of suspects who were under the influence of drugs and/or alcohol. He is trained to detect indicators of intoxication and did not observe Defendant exhibit any such signs. Defendant's observations are consistent with those of the officers who initially received Defendant at Police Headquarters, as Defendant was not held in the location where jailers put suspects who are drunk or high. Detective Eastwood's testimony concerning Defendant's statement about a man having an affair with his wife is consistent with Ms. Bennett's statement to Special Agent Cassidy. The portion of her statement concerning Defendant's behavior does not disprove Detective Eastwood's testimony that Defendant was not intoxicated. Ms. Bennett did not state she saw Defendant ingest drugs and/or alcohol, or even that she knew he had done so; she merely stated Defendant "appeared" to be under the influence because he incorrectly believed someone was in the house. I, therefore, give more weight to the testimony of Detective Eastwood and find that Defendant's waiver and subsequent statement were not involuntary due to intoxication. Defendant's statement should not be suppressed on this ground.

There is also conflicting evidence concerning whether Defendant asked for an attorney. Defendant testified that he did request an attorney. However, Detective Eastwood testified Defendant never asked for an attorney and, if he had, stated he would have taken Defendant back to his cell. As stated above, I find Detective Eastwood's testimony to be more credible than that of Defendant. Defendant's statement thus should not be suppressed on grounds of an invalid waiver.

**B.      Voluntariness of Statement**

A statement is voluntarily given when, in light of the totality of the circumstances, the defendant made the statement on his own accord rather than as a result of succumbing to improper pressure from law enforcement officers. See Davis v. North Carolina, 384 U.S. 737, 739 (1966). In determining if a statement was voluntarily given, courts consider whether the statement "was extracted by threats, violence or direct or implied promises, such that the defendant's 'will [was] overborne and his capacity for self-determination critically impaired.'" United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (citations omitted).

In this case, Defendant's statement was voluntary. The interrogation lasted thirty to forty-five minutes; Detective Eastwood read Defendant his Miranda rights at 9:51 p.m. and returned him to his cell at 10:35 p.m. The record does not show Detective Eastwood utilized threats, violence or promises to elicit responses from Defendant. In fact, defense counsel stated during the suppression hearing that Defendant was not challenging this issue (Tr. at 50-51). I, therefore, find that Defendant's will was not overborne and he retained his capacity for self-determination.

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress Statement.

Government counsel and Defendant are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

 /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 20, 2007