IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 06-00391-01-CR-W-FJG |
| ALPHONZO HENDERSON, | ) ) ) |
| Defendant. | ) ) |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS WEAPON**

Before the court is Defendant's Motion to Suppress the Weapon in Lieu of Third Party Consent (Doc. No. 88). Defendant moves the court to suppress the firearm recovered from 2200 Oakley, Kansas City, Missouri, arguing that (1) police unlawfully entered and searched the bedroom where the firearm was recovered, and (2) police did not have a warrant or probable cause for his arrest. In Defendant's reply to the government's suggestions in opposition, he also challenges the manner in which the suppression hearing was conducted on the following grounds: (1) Defendant was not allowed to confront the witnesses against him; (2) the Court admitted hearsay into evidence; and (3) Defendant was not notified of the October 3, 2007, suppression hearing. For the following reasons, Defendant's motion should be denied in its entirety.

*I. BACKGROUND*

On October 22, 2006, Kansas City, Missouri Police Officers Rebecca Mills and Kip Ackerson responded to 2214 Oakley, Kansas City, Missouri, to investigate a suspicious party armed

1

with a gun. J.B.[1] informed them that Defendant was at 2200 Oakley, was armed with a gun and threatening to kill a man he thought to be in the house. Officer Mills, Officer Ackerson and Sergeant Doll proceeded to 2200 Oakley and were granted entry by Allie Bennett. Allie Bennett told the officers that Defendant was in the bedroom and had a gun. Sergeant Doll and Officer Ackerson knocked on the bedroom door and, when no one answered, opened the door. A loaded firearm was located under the sheet on the bed next to which Defendant was standing.

On September 10, 2007, Defendant elected to represent himself (Doc. No. 93). He then filed the instant pro se motion to suppress evidence that same date (Doc. No. 88). I ordered the government to respond to Defendant's motion (Doc. No. 94). On September 24, 2007, the government filed its response (Doc. No. 99). A suppression hearing was held on October 2, 2007. The government appeared by Assistant United States Attorney Stefan Hughes. Defendant appeared pro se and with standby counsel Anita Burns. The government called Kansas City, Missouri Police Department Officers Rebecca Mills and Kip Ackerson to testify. Defendant testified on his own behalf. In addition, the offense report was marked and admitted into evidence as Government's Exhibit 1. During the hearing, Defendant requested a continuance so that he could present the testimony of Veronica Bennett and an affidavit from J.B. I granted Defendant's request and the suppression hearing was continued until October 3, 2007, at which time Veronica Bennett testified by telephone (See Doc. No. 105). Defendant also filed a reply to the government's suggestions in opposition on October 3, 2007 (Doc. No. 116). J.B.'s affidavit was filed on October 4, 2007 (Doc. No. 112).

---

[1] "J.B." is a juvenile and will, therefore, will be identified only by his initials.

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearings and J.B.'s affidavit, I submit the following findings of fact:

1. Officer Rebecca Mills has been employed by the Kansas City, Missouri Police Department for approximately five years (10/02/07 Tr. at 7, 22).

2. Officer Kip Ackerson has been employed by the Kansas City, Missouri Police Department for approximately three and a half years (10/02/07 Tr. at 24-25, 44).

3. At approximately 7:08 p.m., on October 22, 2006, Kansas City, Missouri Police Officers Rebecca Mills and Kip Ackerson were dispatched to 2214 Oakley, Kansas City, Missouri, to investigate a suspicious party armed with a gun (10/02/07 Tr. at 7-8, 18-19, 25, 36; Gvt. Exh. 1). The individuals who called the police were J.B. and Jamie Deets (10/02/07 Tr. at 8, 25, 36). J.B. was the ten-year-old son of Veronica Bennett who lived at 2200 Oakley; Jamie Deets was a resident at 2214 Oakley (10/02/07 Tr. at 8; 10/03/07 Tr. at 11). J.B. had placed the call from Mr. Deets' home (10/02/07 Tr. at 9).

4. When the officers arrived at 2214 Oakley, J.B. told Officers Mills and Ackerson that his mother's husband (Defendant) was armed with a gun (10/02/07 Tr. at 8-9, 14, 19, 25, 33, 36). J.B. was cooperative and told Officer Mills that Defendant was walking around the house with a shotgun saying he was "going to kill him," and asking "where is he" (10/02/07 Tr. at 15, 19, 33; Gvt. Exh. 1). J.B. was very upset (10/02/07 Tr. at 23, 36).

5. Officers Mills and Ackerson then went to 2200 Oakley (10/02/07 Tr. at 9, 19-20, 26, 36; Gvt. Exh. 1). Sergeant Doll also arrived by separate vehicle (10/02/07 Tr. at 9). This is a high-crime area (10/02/07 Tr. at 14).

6. When they arrived, it was dark outside; the officers knocked on the door and heard a voice respond, "Come in, I can't - - I cannot make it to the door, I'm handicapped." (10/02/07 Tr. at 10, 14, 20, 26; Gvt. Exh. 1). The officers opened the door and observed Allie Bennett, Veronica Bennett's 77-year-old mother, in the living room (Tr. at 10). Officer Mills observed she was unable to get up (10/02/07 Tr. at 11). Allie Bennett appeared to have expected the officers arrival (10/02/07 Tr. at 11). She pointed to a room and whispered, "He's in there. He has gun." (10/02/07 Tr. at 10, 11, 26, 33, 36). Allie Bennett's whisper was loud enough for the officers to hear but not so loud that everyone else could also hear (10/02/07 Tr. at 11).

7. Officer Mills stayed in the living room with Allie Bennett to make sure she was safe and also to watch the rest of the house while Officer Ackerson cleared another bedroom and Sergeant Doll cleared the house's only bathroom; no one was found in either room (10/02/07 Tr. at 11, 20, 27, 37, 64). Officer Ackerson and Sergeant Doll then went to the room to which Allie Bennett had pointed (10/02/07 Tr. at 27, 37).

8. As Officer Ackerson and Sergeant Doll approached the room, a light was shining underneath the door (10/02/07 Tr. at 12, 27, 33; Gvt. Exh. 1). The officers could hear undecipherable whispering inside the room (10/02/07 Tr. at 12, 28, 33). When Officer Ackerson and Sergeant Doll knocked on the door and identified themselves

4

as the police, the light went off and the whispering stopped (10/02/07 Tr. at 12, 28-29; Gvt. Exh. 1).

9. Consistent with Kansas City, Missouri Police Department policy, Officer Ackerson and Sergeant Doll continued to knock, announce who they were, and request that the individuals inside the room open the door and come out (10/02/07 Tr. at 12).

10. The fact that the light was turned off and the conversation ceased put Officer Ackerson and Sergeant Doll on high alert (10/02/07 Tr. at 29). Officer Ackerson testified he thought the individuals were trying to conceal that they were in the room and possibly hiding a weapon or getting into a better position to do harm (10/02/07 Tr. at 29). Officer Ackerson and Sergeant Doll did not know whether Defendant was holding Veronica Bennett against her will, whether he was planning to shoot either himself or Veronica Bennett, whether he was attempting to hide the gun, or if he was trying to escape (10/02/07 Tr. at 15-16, 33). Consistent with their training, Officer Ackerson and Sergeant Doll drew their weapons (10/02/07 Tr. at 29, 38).

11. The individuals inside the room never came to the door nor indicated they planned to do so (10/02/07 Tr. at 30). After approximately one or two minutes, Sergeant Doll opened the door (10/02/07 Tr. at 12, 30, 37; Gvt. Exh. 1). Defendant and Veronica Bennett were in the room standing next to the bed (10/02/07 Tr. at 12-13, 14, 30-31).

12. Officer Ackerson and Sergeant Doll did not call an Operation 100; Officer Ackerson believed something worse could happen if they did not act immediately (10/02/07 Tr.

5

at 37-38, 46). He did not believe there was time to secure a warrant (10/02/07 Tr. at 49).

13. Defendant was immediately patted down and handcuffed for officer safety, since he was the only male in the room and thought to be armed with a weapon; the room was then secured (10/02/07 Tr. at 31, 43). Sergeant Doll located a loaded shotgun under the sheet on the bed that Defendant and Veronica Bennett had been standing next to (10/02/07 Tr. at 13, 32, 39, 40, 55). Officer Ackerson recovered the weapon and rendered it safe (10/02/07 Tr. at 32, 45). At this point, the house was still uncleared (10/02/07 Tr. at 47).

14. Defendant did not object to the search (10/02/07 Tr. at 49).

15. Police secured 2200 Oakley before they left (10/02/07 Tr. at 34). Besides Defendant, there were no other men located inside the residence (10/02/07 Tr. at 34-35).

16. Officer Mills interviewed Allie Bennett (10/02/07 Tr. at 14). Allie Bennet was cooperative (10/02/07 Tr. at 14). She stated 2200 Oakley was her residence and that she lived there (10/02/07 Tr. at 16, 32-33, 38, 40). Allie Bennett said that, prior to the officers' arrival, Defendant very angry (10/02/07 Tr. at 15). She stated he walked around the house with a shotgun yelling, "Where is he? I'm going to kill him. Where is he?" (10/02/07 Tr. at 15).

17. Officer Mills testified Allie Bennett did not give police consent to search the house (10/02/07 Tr. at 21). Officer Ackerson testified Allie Bennett did give police consent to search the residence (10/02/07 Tr. at 39). Officer Ackerson also stated Veronica Bennett objected to the search (10/02/07 Tr. at 40).

18. Officer Mills also interviewed Veronica Bennett (10/02/07 Tr. at 14, 20-21, 44-45; Gvt. Exh. 1). Veronica Bennett was uncooperative and appeared angry; she did not answer all of the questions that were asked of her (10/02/07 Tr. at 21, 22; Gvt. Exh. 1). She told police she had not called them and that they did not have a reason to be there (10/02/07 Tr. at 21, 43).

19. Defendant was placed under arrest for two Kansas City warrants, a bench warrant for a probation violation, and for investigation of being a felon in possession (10/02/07 Tr. at 16, 35).

20. Defendant testified at the suppression hearing that on October 22, 2006, he took chicken over to 2200 Oakley (10/02/07 Tr. at 58, 63). Veronica Bennett opened the door and let him in (10/02/07 Tr. at 58, 64). After placing the chicken on the table, Defendant went to the bathroom (10/02/07 Tr. at 59, 64). He stated he was in the bathroom -- not in the bedroom with Veronica Bennett -- when police arrived (10/02/07 Tr. at 59, 64). Defendant testified that after police placed him in handcuffs, Veronica Bennett opened the door to her bedroom (10/02/07 Tr. at 59). He believed Officers Mills and Ackerson were either mistaken or misleading the Court when they testified he was in Veronica Bennett's bedroom with her (10/02/07 Tr. at 65).

21. Defendant further testified Veronica Bennett asked the officers, "Why are you here? What are you doing in my home?" (10/02/07 Tr. at 59). Sergeant Doll responded, "There's nothing going wrong. All we want to do is find out - - the only reason we're here is to see what's up." (10/02/07 Tr. at 60). Defendant stated he asked why

he was being handcuffed and whether he was under arrest, to which the officers responded "no" (10/02/07 Tr. at 60).

22. Defendant testified Officer Ackerson patted him down and did not find any weapons (10/02/07 Tr. at 60). The officers placed him on the front porch and then entered Veronica Bennett's bedroom (10/02/07 Tr. at 60). According to Defendant, Officer Ackerson pushed past Veronica Bennett and she asked him, "Why are you in my bedroom? What do you want? What are you looking for?" (10/02/07 Tr. at 60). Defendant stated that while Officer Ackerson was searching the bedroom, he informed Sergeant Doll that Officer Ackerson had not obtained Veronica Bennett's permission or consent (10/02/07 Tr. at 60, 65).

23. Defendant testified that, while sitting on the porch, he could hear Veronica Bennett and Officer Ackerson arguing (10/02/07 Tr. at 60). He stated he heard Veronica Bennett state, "Why are you in my room tearing up my room? Get out of my house. I did not call you." (10/02/07 Tr. at 60-61, 66-67). As he was being placed in the police wagon, Defendant heard Veronica Bennett say, "Get out of my house. Why don't you going - - why don't you write down what I'm telling you to write down.", but that officers refused to take her statement (10/02/07 Tr. at 62, 66).

24. Defendant testified he does not live at 2200 Oakley and that he did not have dominion or control over anything in the residence (10/02/07 Tr. at 62, 65-66). He did not think either Allie Bennett or Veronica Bennett was the lessee or owner of the home, but did not know who was (10/02/07 Tr. at 65).

8

25. J.B. testified by affidavit that Defendant thought someone hit Veronica Bennett in the face and that Defendant was mad (Doc. No. 112). J.B. further testified the neighbor called the police and that he did not remember anything else (Doc. No. 112).

26. Veronica Bennett is disabled (10/03/07 Tr. at 30). She has diabetes and a problem with her heart (10/03/07 Tr. at 25, 31). She is legally blind in her right eye, but can see "a little" out of her left eye; she cannot drive (10/03/07 Tr. at 26, 28, 31).

27. Veronica Bennett testified that she called Defendant on October 22, 2006, and asked him to bring chicken to 2200 Oakley (10/03/07 Tr. at 11). When Defendant arrived, he knocked on the door and she let him in (10/03/07 Tr. at 13). Veronica Bennett stated after he placed the chicken on the table, they went into her bedroom together (10/03/07 Tr. at 13, 15). She further stated that when Defendant left to go to the bathroom, police began knocking on her bedroom door (10/03/07 Tr. at 12-13). Veronica Bennett stated Defendant then emerged from the bathroom and asked the officers why they were there (10/03/07 Tr. at 14).

28. Veronica Bennett testified the police pushed open her bedroom door and started searching the room without her consent (10/03/07 Tr. at 14, 15). She stated she protested while the police searched her bedroom (10/03/07 Tr. at 14, 21). Police found the gun on her bed (10/03/07 Tr. at 27).

29. Veronica Bennett testified that she and Defendant were not involved in a domestic disturbance on October 22, 2006 (10/03/07 Tr. at 15). She stated her neighbor, not J.B., called the police and that he did not know what to say (10/03/07 Tr. at 19). Veronica Bennett said Defendant was not running through the house, searching for

9

Case 4:06-cr-00391-ODS   Document 117   Filed 10/09/07   Page 9 of 19

a man, or stating that he was going to kill someone; she also said Defendant had never seen the firearm (10/03/07 Tr. at 17-18, 21, 32).

30. Veronica Bennett testified she owned the firearm that police recovered from her bedroom (10/03/07 Tr. at 15). She stated she bought it on December 21, 2006, for $44 dollars from a man named "Harry" on the steps in front of her house; she did not know Harry's last name (10/03/07 Tr. at 15, 29, 32). She bought the gun for protection (10/03/07 Tr. at 16, 17, 29). Veronica Bennett stated she did not have a receipt from purchasing the gun (10/03/07 Tr. at 30). She did not register the firearm with the police department (10/03/07 Tr. at 30). She stated she only had one shell for the firearm (10/03/07 Tr. at 30).

31. Veronica Bennett stated neither Defendant, Allie Bennett, nor J.B. knew she owned the firearm (10/03/07 Tr. at 17, 18, 26-27, 32). She testified she kept the firearm under lock and key (Tr. at 32). She did not tell Defendant about the firearm because she did not want to tell him she had been with another man (10/03/07 Tr. at 19, 32).

32. Veronica Bennett testified that her brother, Maurice Bennett, was the legal lessee of 2200 Oakley (10/03/07 Tr. at 16-17, 28). According to Veronica Bennett, Maurice Bennett no longer lives at 2200 Oakley, but his name remains on the lease (10/03/07 Tr. at 29). Allie Bennett, Veronica Bennett and J.B. all live at 2200 Oakley (Tr. at 16). Veronica Bennett stated Defendant did not live at 2200 Oakley and that he had his own home; therefore, the bedroom where the firearm was found was not Defendant's bedroom (10/03/07 Tr. at 16, 28).

10

Case 4:06-cr-00391-ODS   Document 117   Filed 10/09/07   Page 10 of 19

33. When Veronica Bennett gave a statement to Anita Burns and Allen Bush with the Federal Public Defender's Office on December 7, 2006, she stated she had called Defendant on October 22, 2006, and asked him to bring over some chicken (10/03/07 Tr. at 22-23). When he arrived, he thought he saw blood on her face (10/03/07 Tr. at 24). She recalled him saying, "Where's the man? Where's the man?", and being concerned that someone had hit her and left blood on her eye (10/03/07 Tr. at 25). Veronica Bennet stated she and Defendant went into her bedroom and were talking and that they may have been loud (10/03/07 Tr. at 24-25).

## III. LEGAL ANALYSIS

Defendant's motion to suppress seeks suppression of the firearm recovered from 2200 Oakley on multiple bases. He alleges "that police officers violated his constitutional rights by conducting an 'illegal search and seizure'" and for "arresting him without 'probable cause' and without a warrant." In order to provide Defendant a thorough and complete analysis, I will analyze the legality of the officers' actions from the time they arrived at 2200 Oakley until Defendant was ultimately arrested.

**A.      Entry into House**

The Fourth Amendment guarantees the right against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless entries are generally found to be unreasonable unless an exception to the warrant requirement exists. United States v. Uscanga-Ramirez, 475 F.3d 1024, 1027 (8th Cir. 2007); United States v. Varner, 481 F.3d 569, 571 (8th Cir. 2007); United States v. Leveringston, 397 F.3d 1112, 1114 (8th Cir. 2005). Two such exceptions include consent and exigent circumstances. Varner, 481 F.3d at 572; Uscanga-Ramirez, 475 F.3d at 1027-28.

11

### 1. Consent

The Fourth Amendment's general prohibition against warrantless entries into a person's home does not apply when police have obtained voluntary consent to do so. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Consent may be given either by the individual who owns the property, Schneckloth v. Bustamonte, 412 U.S. 218 (1973), or by a third party who possesses common authority over the premises, United States v. Matlock, 415 U.S. 164, 171 (1974). Common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock. 415 U.S. at 171 n.7.

In this case, the record contains conflicting evidence concerning who owned 2200 Oakley. The record is clear, however, that at a minimum Allie Bennett possessed common authority over the residence. Allie Bennett told Officer Mills she lived at 2200 Oakley. Veronica Bennett also testified that Allie Bennett lived at 2200 Oakley. Importantly, Defendant does not challenge Allie Bennett giving police consent to enter the residence; rather, his sole complaint is that Allie Bennett did not have authority to allow police to search the room where the firearm was located. I, therefore, find that Allie Bennett possessed common authority over 2200 Oakley and could grant officers entry into the residence when they arrived.

### 2. Exigent Circumstances

Police may also enter a home without a warrant when justified by exigent circumstances. United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996). The Eighth Circuit has held that both a reasonable fear of harm and a reasonable belief that a person is in need of immediate aid constitute

12

exigent circumstances.  Mincy v. Arizona, 437 U.S. 385, 392 (1978)(stating Fourth Amendment allows warrantless entries when police "reasonably believe that a person within is in need of immediate aid"); United States v. Williams, 633 F.2d 742, 744 (8th Cir. 1980)("When there is a reasonable fear of harm, a warrantless entry may be justified."); Root v. Gauper, 438 F.2d 361, 364 (8th Cir. 1971).  This exception to the warrant requirement allows police to act when there is "compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509 (1978).  In evaluating whether a warrantless entry was justified by exigent circumstances, courts apply an objective standard.  Uscanga-Ramirez, 475 F.3d at 1928; Leveringston, 397 F.3d at 1116.

In this case, exigent circumstances did justify Sergeant Doll, Officer Mills and Officer Ackerson's entry into 2200 Oakley.  Officers Mills and Ackerson were dispatched to 2214 Oakley to investigate a suspicious party armed with a gun.  Upon their arrival, J.B. told them that his mother's husband was at 2200 Oakley and was walking around the house with a gun stating he was going to kill someone; J.B. was very upset.  The residence, 2200 Oakley, is located in a high-crime area.  Given these facts, a reasonable police officer would have felt there was not time to secure a warrant in order to prevent harm inside 2200 Oakley or to render immediate aid to its occupants.  I therefore find that exigent circumstances justified the warrantless entry into 2200 Oakley and recommend that Defendant's motion to suppress be denied on this basis.

**B.      Entry into and Search of Room**

Defendant contends that the search of the bedroom was the result of an illegal search and seizure and the firearm recovered should, accordingly, be suppressed.  He specifically argues that

13

Allie Bennett did not have authority to give police consent to search the bedroom over Veronica Bennett's objections. There is conflicting testimony as to whether Allie Bennett gave the police consent to search Veronica Bennett's bedroom. Resolution of this conflict is not necessary, however, as the record makes clear the warrantless search of the bedroom was justified by exigent circumstances. As stated above, a warrantless entry does not violate the Fourth Amendment when justified by exigent circumstances. Ball, 90 F.3d at 263. Reasonable fear of harm and a reasonable belief that a person is in need of immediate aid constitute such circumstances, and allow police to act when there is not time to first secure a warrant. Mincy, 437 U.S. at 392; Tyler, 436 U.S. at 509; Williams, 633 F.2d at 744; Root, 438 F.2d at 364. Once inside the premises, a "warrantless seizure of a weapon may be considered 'reasonable' within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety." United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989)(citing New York v. Quarles, 467 U.S. 649, 653 (1984)).

Here, J.B. told Officers Mills and Ackerson that his mother's husband was at 2200 Oakley and was walking around the house with a gun stating he was going to kill someone. After the officers had entered the residence, Allie Bennett pointed to the bedroom and whispered, "He's in there. He has a gun."; her whisper was not loud enough for anyone but the officers to hear. Sergeant Doll and Officer Ackerson observed the light in the bedroom go off and heard the whispering inside the room cease, which put them on high alert. Officer Ackerson testified he thought the individuals inside the room were possibly trying to conceal that they were in the room, hide a weapon, or get in a better position to do harm. Additionally, Sergeant Doll and Officer Ackerson did not know if Defendant was holding Veronica Bennett against her will, planning to shoot himself or Veronica Bennett, hiding the firearm, or trying to escape. The individuals inside the room never answered the

14

door or otherwise responded to the officers' knocks. Officer Ackerson testified there was not time to obtain a warrant and that he feared something worse would happened if they did not act immediately. Given these facts, a reasonable police officer would have believed that exigent circumstances justified a warrantless entry into the bedroom.

The officers' search for the firearm once inside the bedroom was also reasonable. Both J.B. and Allie Bennett had reported a male having a gun. Upon opening the door, they observed Defendant to be the only male in the room so thought he was armed with a weapon. When officers did not locate a weapon on Defendant's person, they secured the room and located a loaded firearm under a sheet on the bed next to which Defendant had been standing. At this point, the house had not yet been cleared and Veronica Bennett was still in the room. I find this search was conducted out of the officers' legitimate concern for safety. Defendant's motion to suppress on this ground should be denied.

In making this finding, I give more weight to the testimony of Officer Mills and Officer Ackerson and discredit Defendant and Veronica Bennett's testimony regarding Defendant's location when the police entered the bedroom. Allie Bennett told the officers Defendant was in the bedroom when they arrived at 2200 Oakley. Sergeant Doll had cleared the only bathroom in the house and did not find anyone there. Officer Mills and Officer Ackerson each testified at the October 2, 2007, suppression hearing that Defendant was inside the bedroom; the offense report also states Defendant was found inside the bedroom. Although Defendant testified that he was in the bathroom, I do not find his testimony to be credible as he stated in his motion to suppress that he was, in fact, in the bedroom helping Veronica Bennett with her clothes (See Doc. No. 88, at p. 2). Similarly, Veronica Bennett's testimony is not credible. She testified at the October 3, 2007, suppression hearing that

15

she bought the firearm on December 21, 2006, a date approximately two months after the incident had occurred. She also testified that she kept the gun under "lock and key," yet the gun was lying on the bed when police searched her room. Lastly, Veronica Bennett's testimony at the suppression hearing that Defendant was not running through the house on October 22, 2006, searching for a man is inconsistent with the statement she gave to the Federal Public Defender's Office on December 7, 2006, wherein she said Defendant had been looking for a man he thought had hit her on the face. The totality of these inconsistencies, coupled with the consistent testimony offered by Officers Mills and Ackerson, leads me to find the testimony of Officers Mills and Ackerson more credible.

**C.     Legality of Arrest**

Defendant argues that because police neither had a warrant nor probable cause, his arrest was illegal. This argument is without merit. Probable cause for arrest exists when police know that an individual has outstanding warrants. United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992). Here, the officers knew that Defendant had two Kansas City warrants and a bench warrant for a probation violation. Probable cause thus existed for the officers to lawfully arrest Defendant.

**D.     Challenges to Suppression Hearing**

On October 3, 2007, Defendant filed a "response and suggestions in opposition," in which he, inter alia, objected to various aspects of the October 2, 2007, suppression hearing. Specifically, Defendant argues (1) that he was not allowed to confront witnesses against him, (2) that I improperly admitted hearsay evidence, and (3) that he was not given proper notice of the October 2, 2007, suppression hearing. The reasons each of these arguments must fail are discussed below.

16

1.  **Confrontation Clause**

"The Confrontation Clause guarantees defendants the opportunity to effectively cross-examine adverse witnesses." United States v. Lightfoot, 483 F.3d 876, 879 (8th Cir. 2007); see also U.S. Const. amend. VI. Defendant asserts a violation of the Confrontation Clause, in that he was not "allowed to cross examine any alleged witnesses against him" during the October 2, 2007, suppression hearing (See Doc. No. 116, at p. 9). He identifies Sergeant Doll, Allie Bennett, and J.B. as the witnesses he wishes to have examined (See Doc. No. 116, at p. 9). Importantly, the government did not call Sergeant Doll, Allie Bennett, or J.B. to testify at the suppression hearing. Defendant, therefore, could not have been denied his right to cross-examine them. If he wanted to elicit these individuals' testimony on issues pertaining to suppression of the firearm, he should have called them as witnesses himself. As a result, I find that Defendant's right to confrontation was not violated.

2.  **Hearsay Evidence**

Defendant next contends that I erred in admitting Officers Mills and Ackerson's respective hearsay testimony. "At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980); see also United States v. Henderson, 471 F.3d 935, 938 (8th Cir. 2006). This is so because "the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself." Raddatz, 447 U.S. at 679. Since controlling Eighth Circuit law allows the admission of hearsay evidence at a suppression hearing, I find Defendant's contention to be without merit.

17

**3.     Lack of Notice for Hearing**

Defendant maintains that he was not given notice of the October 2, 2007, suppression hearing and was, accordingly, unable to subpoena Veronica Bennett to testify on his behalf (Doc. No. 116, at p. 12).  A review of the docket sheet in this case reveals that I entered an order on September 25, 2007, scheduling a hearing on Defendant's motion to suppress, Document Number 88, for October 2, 2007 (Doc. No. 101).   A copy of this order was mailed to Defendant on September 25, 2007 (See Doc. No. 101).  At the time the order was entered, Defendant's motion to suppress the firearm was the only motion to suppress for which a hearing had not been conducted, as I had already held a hearing and filed a Report and Recommendation on Defendant's motion to suppress his statement (See Doc. No. 97).   Accordingly, I find that Defendant did receive notice of the October 2, 2007, suppression hearing.  Even if he had not, any prejudice Defendant perceives that he suffered was remedied when I continued the suppression hearing until October 3, 2007, so as to allow Defendant to present the testimony of Veronica Bennett and J.B.

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress Weapon in its entirety.

Government counsel and Defendant are advised that, pursuant to 28 U.S.C. § 636(b)(1) they must file and serve specific objections to this Report and Recommendation **no later than noon on Friday, October 19, 2007**, unless an extension of time for good cause is obtained.  <u>Defendant is advised to allow enough time for his objections to arrive by mail or to make arrangements for standby counsel file his objections before this deadline</u>.  Failure to file and serve timely specific

18

objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 9, 2007